UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **VANENKEVORT TUG AND BARGE, INC.,** | ) ) ) | **CASE NO. 5:08CV2071** |
| **Plaintiff,** | ) ) | **JUDGE SARA LIOI** |
| v. | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| **LAFARGE NORTH AMERICA, INC., ET AL.** | ) ) ) | **(NUNC PRO TUNC)** |
| **Defendants.** | ) | |

This matter arises out of the motion of Plaintiff VanEnkevort Tug & Barge, Inc., ("VTB") for approval of change of ownership in the Great Lakes Trader (barge) and the Joyce L. VanEnkevort (tug) (together, the "integrated tug barge" or "ITB"). (Doc. No. 57.) Defendants Lafarge North America and Lafarge Presque Isle, Inc., (together, "Lafarge") filed an opposition. (Doc. No. 58.) VTB thereafter filed a brief in further support of its motion. (Doc. No. 59.) The Court conducted a telephone conference on October 13, 2009, and heard oral argument on this matter on October 21, 2009. This matter is ripe for decision.

**I.  BACKGROUND**

VTB is a Michigan corporation with its principal place of business located in Bank River, Michigan. VTB is in the business of operating tug barges on the Great Lakes. Lafarge is a Delaware corporation with its principal place of business in Streetsboro, Ohio. Lafarge is a family of companies that is engaged in, among other things and relevant here, the transportation of aggregates and other building materials.

In August 2008, VTB filed a lawsuit seeking declaratory relief to determine the rights and obligations of the parties with respect to their various agreements. On January 21,

2009, the Court entered a consent order ("the Consent Order") after an agreement was reached between the parties related to the 2009 navigation season. (Doc. No. 33.) Relevant to this matter is the third paragraph of that consent order, which states that:

> VTB shall not close on any contract or agreement that terminates, transfers, sells, assigns or mortgages any ownership interest and/or leasehold interest, it may presently have in any of the following vessels: the Great Lakes Trader, Joyce L. Vanenkevort, Joseph H. Thompson and the Joseph H. Thompson, Jr. during the period that this Order is in effect [the earlier of December 31, 2009 or further Order of this Court] or without further Order of this Court.

(Consent Order ¶ 3.) The case then further proceeded to mediation and was settled on March 19, 2009.

On April 19, 2009, VTB and Lafarge entered a Settlement and Operating Agreement ("the Operating Agreement"). The Operating Agreement is to commence on January 1, 2010, and runs through February 28, 2028, and contains a provision for automatic renewal. The Operating Agreement expressly notes that "[t]his Agreement is not intended to alter the terms of the Agreement and Consent Order dated January 21, 2009." (Operating Agreement ¶ 1, n.1.) Further relevant to this matter, the Operating Agreement contains an assignment provision:

> This Agreement shall be binding upon the parties hereto and their respective successors and assigns; provided, however, that this Agreement and the rights and obligations hereunder shall not be assignable by either party without the prior written consent of the other party, which written consent shall not be unreasonably withheld. Either party may, however, without such written consent, assign to a company having common ownership or to a purchaser of all or substantially all of the assets of the selling party, provided that the assigning or selling party guarantees the performance of all of the obligations under this Agreement by such assignee or purchaser.

(Operating Agreement ¶ 9.) The parties vigorously dispute the meaning of this section of the Operating Agreement.

On September 2, 2009, VTB communicated to Lafarge, through counsel, that VTB had struck a deal selling its assets to KK Integrated Logistics. (Doc. No. 58 at p. 7.) VTB

2

acknowledged that Court approval was necessary to complete the transfer and sought Lafarge's consent to the transfer. (*Id.*) After Lafarge objected to the timing of the consent request, which was apparently transmitted on the eve of the deal's intended consummation, Lafarge and the principal of KK Integrated Shipping, Tom Kuber, engaged in detailed conversations regarding the proposed deal. (*Id.* at p. 8.) Kuber *voluntarily* provided draft copies of all the closing documents to Lafarge, and Kuber *agreed* to execute a performance guaranty whereby KK Integrated Shipping (an affiliated arm of KK Integrated Logistics) would expressly guarantee VTB's performance under the Operating Agreement. (Doc. 58 at p. 8.) The deal was never consummated.

VTB next communicated to Lafarge, again through counsel, that VTB had reached an agreement with Mid Ocean Marine, LLC, ("Mid Ocean") and its affiliates, on October 8, 2009. VTB also sought same-day consent to the transaction from Lafarge. The terms of that deal, to the Court's understanding, are as follows: as things currently exist, the legal owner of the ITB is an entity known as Great Lakes Marine Leasing LLC ("Great Lakes Marine"). VTB owns 53% of the membership interests of Great Lakes Marine and Capstan Marine LLC, a non-party entity owned by Joe Tennant, owns the remaining 47%. Mid Ocean is wholly owned by Nickel and Volckert Van Reesema.

Under the proposed deal, in relevant part, Mid Ocean will acquire 55% of VTB's common stock and VTB will transfer its 53% interest in Great Lakes Marine to a new entity, Van Lakes Marine, LLC ("Van Lakes"). Van Lakes will be jointly owned by Mid Ocean and VTB, with Mid Ocean owning 90% of the common stock and VTB owning the remaining 10% as well as some non-voting preferred shares. In exchange, Mid Ocean will recapitalize VTB with a $3,000,000 cash infusion.

Lafarge was once again displeased with the lack of notice given regarding the proposed transaction by VTB. Additionally, and unlike the proposed VTB-KK Integrated Logistics deal, Mid Ocean refused to provide written documentation concerning the proposed sale, including financial data relating to Mid Ocean. Furthermore, and also unlike the previous deal, Mid Ocean is apparently unwilling to give Lafarge an express guaranty as to VTB's performance of the Operating Agreement.

On October 9, 2009, VTB filed a sealed motion seeking this Court's approval of the transfer of the ITB pursuant to the Consent Order. (Doc. No. 57.) VTB asserts in its motion, and attached declaration of Dirk VanEnkevort, president of VTB, that the transfer of the ITB is necessary to recapitalize the business and continue operations. Mr. VanEnkevort further asserts that the 2009 Navigation Season has been particularly difficult for VTB. (Doc. No. 57 at p. 20.) At oral argument, counsel for VTB asserted that the company would be out of cash within the week if this transfer is not approved.

The parties agree that, pursuant to the Consent Order, this Court's approval is required for the VTB to Mid Ocean transfer to proceed prior to December 31, 2009. Lafarge further contends that the transfer is prohibited without Lafarge's prior consent under the Operating Agreement. The Court will consider each argument *seriatim*.

**II.  DISCUSSION**

**A.  The Consent Order**

The Consent Order clearly requires this Court's approval prior to any transfer of the ITB if it occurs prior to December 31, 2009. The parties do not dispute this fact.

It is important to understand the context of the Court's Consent Order. That Order was entered in response to a motion for preliminary injunction filed by Lafarge on December 24,

4

2008. (Doc. No. 25.) It is clear from the Consent Order that it was intended to address the parties', and especially Lafarge's, immediate concerns as they related to the 2009 navigation season, and to establish a working relationship between the two parties for the 2009 season while litigation continued. The purpose of the paragraph 3 restriction requiring this Court's approval for VTB to close on any contract or agreement that affects its interest in the ITB was to ensure *VTB's* performance during the 2009 navigation season.

The Consent Order specifies that "Lafarge shall provide, and Vanenkevort Tug and Barge, Inc. ('VTB') shall transport, 1.3 million tons of aggregate during the 2009 Great Lakes navigation season." (Consent Order ¶ 1.) The 2009 navigation season has not yet concluded. However, based on representations of counsel at oral arguments, there is absolutely no indication that VTB has not performed its obligations under the Consent Order to date. Nor, significantly, does Lafarge argue that the proposed transfer of the ITB to Mid Ocean will impact VTB's ability to perform for the remainder of the 2009 navigation season as required by the Consent Order.[1] Indeed, counsel for both parties indicated at oral argument that neither expected *Lafarge* to be able to satisfy its obligations under the agreement based upon the tonnage provided to date and the time remaining in the 2009 season.[2]

In the absence of both an argument that the proposed ITB transfer will impact VTB's performance during the 2009 navigation season and any evidence indicating such performance will be in fact impacted, the Court finds no reason to withhold its consent to the

---

[1] As addressed below, Lafarge argues that "it is important that Lafarge has the certainty of relying upon VTB to ship its aggregates throughout 2028 *under the Settlement and Operating Agreement*. A change in ownership, without proper guarantees to Lafarge, will significantly hinder, if not impede, *this reliance*." (Doc. No. 58 at p.11.)
[2] Counsel for VTB suggested to the Court that, related to the 2009 navigation season, "[t]hey're [Lafarge] in breach." The Court disagrees, and to make explicitly clear, this Court does not find Lafarge is in breach of the Consent Order. The time for performance under the Consent Order has yet to expire. Nonetheless, at the hearing, both parties agreed that Lafarge has not, to date, provided the requisite tonnage of aggregates required by the Consent Order, and may not meet their obligation by the end of the 2009 season.

5

deal. Therefore, the paragraph 3 restriction in the Consent Order will not bar VTB from transferring the ITB to Mid Ocean.

**B.     The Operating Agreement**

Lafarge next argues that its consent to the ITB transfer is required under paragraph 9 of the Operating Agreement. The Court disagrees.

The Operating Agreement has no effect whatsoever on the proposed transfer of the ITB until January 1, 2010. Paragraph 1 of the Operating Agreement states, in relevant part, that "[t]his Agreement shall commence on January 1, 2010 and shall remain in full force and effect until February 28, 2028 (initial period)." (Operating Agreement ¶ 1.) It is clear from both the expedited briefing and the representations of counsel at the hearing that, if approved, VTB intends to transfer the ITB to Mid Ocean as soon as possible and, in any event, before January 1. Therefore, the Operating Agreement will not bar VTB from transferring the ITB to Mid Ocean.

Even if the Operating Agreement did govern the proposed ITB transfer, the Court is unconvinced that paragraph 9 requires Lafarge's consent. The Operating Agreement specifies that "[t]his Agreement shall be governed by general admiralty and maritime laws and statutes of the United States, and otherwise by the laws and statutes of the State of Ohio." Neither party has addressed which law applies to this specific dispute. This omission, however, is immaterial in this case, as the Court finds the same standard applies regardless of whether Ohio law or general maritime law is applied to the interpretation of paragraph 9, which is unambiguous.

"Drawing from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *E. River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864-65 (1986) (footnote omitted). It should, therefore, not come as a surprise to learn that general federal maritime law has adopted

6

the general rules of contract interpretation and construction. *See, e.g., United States ex rel. E. Gulf, Inc. v. Metzger Towing, Inc.,* 910 F.2d 775, 779 (11th Cir. 1990). "The determination of whether a contract is ambiguous is a question of law for the court." *See East v. Premier, Inc.*, 98 Fed. App'x 317, 319 (5th Cir. 2004). A maritime contract is not ambiguous merely because one of the parties disputes its proper interpretation. *Atl. Dry Dock Corp. v. United States*, 773 F. Supp. 335, 338 (M.D. Fla. 1991). "The parties' language will be deemed conclusively indicative of their intentions where it is reasonably susceptible to only one interpretation." 11 RICHARD A. LORD, WILLISTON ON CONTRACTS, § 32:2 (4th ed. 2006).

Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court. *Parrett v. Am. Ship Bldg. Co*., 990 F.2d 854, 858 (6th Cir. 1993) (applying Ohio law). "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning Ferris Indus. of Ohio, Inc*., 15 Ohio St. 3d 321, 322 (1984). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys v. Auglaize Cty Bd. of Commrs*., 115 Ohio St. 3d 387, 390 (2007).

Paragraph 9 plainly requires written consent for the assignment of "this Agreement and the rights and obligations hereunder" unless the assignment is being made to either 1) a company having common ownership, or 2) a purchaser of all or substantially all of the assets of the selling party. (Operating Agreement ¶ 9.) If the latter situation arises, written consent is not required "provided the assigning or selling party guarantees the performance of all of the obligations under this Agreement by such assignee or purchaser." (Id.)

7

This Court finds a proposed ITB transfer from VTB to Mid Ocean is not an assignment of "this Agreement and the rights and obligations hereunder." VTB is seeking to transfer its 53% interest in the legal ownership of the ITB itself, not any right or obligation to transport aggregates with respect to Lafarge. VTB represents it "will continue as the day-to-day cargo operators of the ITB and will continue to meet its contractual obligations to Lafarge." (Dirk VanEnkevort Decl., Doc. 57 at p. 21, ¶ 8.) The Court cannot conclude that holding legal ownership of the ITB is an absolute requirement to meet the obligations of the Operating Agreement. First, 47% of the ITB is not currently owned by VTB, but by Capstan Marine, LLC. Second, it appears VTB controls at least two other vessels that are not included in the proposed transfer of the ITB, the Joseph H. Thompson and the Joseph H. Thompson, Jr. (Consent Order ¶ 3.) Nothing in the Operating Agreement requires that any specific ITB be used for the transportation of aggregates.

The proposed transfer of the ITB, therefore, is not an assignment of the Operating Agreement or the rights and obligations thereunder. And there is simply no restriction on the transfer of the ITB in the Operating Agreement. Lafarge's written consent is not necessary to consummate of the ITB.

The Court concludes the Operating Agreement is not effective until January 1, and further that the transfer of the ITB is not an assignment of the Operating Agreement. Therefore, the "guarantee" provision of paragraph 9 is not implicated. However, the Court notes that even if it were implicated, that provision only requires a guarantee by the *assigning or selling party*, not by the assignee or the purchaser. In this case, what would be required is the guarantee of VTB for Mid Ocean's performance, not the guarantee of Mid Ocean for VTB's performance. Lafarge's reliance on Kuber's execution of a performance guarantee in conjunction

8

with the earlier, never-consummated transfer from VTB to KK Integrated Logistics is misplaced. Kuber was, of course, free to guarantee whatever he wished. But his guarantee was not required by the Operating Agreement and certainly does not act to require Mid Ocean to make a similar guarantee.

Therefore, the Operating Agreement does not bar the proposed transfer of the ITB from VTB to Mid Ocean.

**C.     Lafarge's Arguments Relating to Irreparable Harm**

In its opposition, Lafarge argues that it "need not seek a temporary restraining order at this juncture to enjoin the sale of VTB's assets because such a sale is prohibited by the existing Order of the Court," but claims it "will incur damages analogous to such relief unless the Motion for Approval is denied." (Doc. 58 at p. 10.) This argument is without merit and will be briefly addressed.

In considering preliminary injunctive relief, a district court must weigh the following four factors:

  (1) the plaintiff's likelihood of success on the merits;

  (2) whether the plaintiff will suffer irreparable harm without the injunction;

  (3) whether granting the injunction will cause substantial harm to others; and

  (4) the impact of the injunction on the public interest.

*Connection Distributing Company v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998). Lafarge's argument that it will incur damages at all, much less irreparable harm, is extremely speculative at this point. VTB has not breached any of its obligations under the Consent Order or the Operating Agreement, nor is there an indication it intends to repudiate those obligations after the proposed

9

transfer. Quite the opposite, VTB is seeking to effectuate this transfer in order to infuse cash into its business to keep afloat to be able to meet its future obligations to Lafarge and others.[3]

Lafarge's argument that it will be without an adequate legal remedy, and therefore suffer irreparable harm, as a result of the proposed ITB transfer is premature. In the first instance, Lafarge has not even alleged that it is entitled to any legal remedy at this point. VTB has not breached any of the agreements between the two parties. Lafarge argues that a district court has the authority to issue a preliminary injunction where a moving party establishes that money damages will be an inadequate remedy due to the impending insolvency of the non-moving party. (Doc. No. 58 at p. 12.) While this may be true in the abstract, an examination of the cases cited by Lafarge in support of this proposition quickly reveal a fundamental distinction.

In *[I]n re Estate of Marcos*, *(Human Rights Litig.)*, 25 F.3d 1467 (9th Cir. 1994), the Ninth Circuit affirmed a district court's decision to enjoin the defendant, the estate of the ex-President of the Philippines, from transferring or dissipating the estate assets during litigation with plaintiffs. In one of the consolidated cases, plaintiffs had already obtained a default judgment. *Id.* at 1469. The district court found a substantial likelihood the plaintiffs would succeed on the merits of the underlying action. *Id.* at 1480.

In *Federal Deposit Insurance Corp. v. First Heights Bank, FSB*, No. 2:95-CV-72722, 1998 U.S. Dist. LEXIS 21524 (E.D. Mich. May 19, 1998), the Court granted the FDIC's motion for a preliminary injunction preventing the dissipation of assets by First Heights Bank. In that case, the FDIC had obtained a court judgment that First Heights Bank breached an assistance agreement between the parties. *Id.* at *5-6. Indeed the Court found that because "the FDIC has

---

[3] The irony of this action, in which Lafarge is opposing a transfer of the ITB, that transfer being necessitated by a cash shortfall that Lafarge itself may be partly responsible for, is not lost on this Court.

already prevailed on the merits of most of its claims," the plaintiff's likelihood of success on the merits requirement was easily satisfied. *Id.* at *8.

In each of these cases, there was an underlying action alleging actionable conduct that warranted damages. This underlying action provided the framework for the courts in those cases to further analyze the plaintiff's likelihood of success on the merits in those actions. In *In re Marcos*, the underlying lawsuit alleged tortious conduct at the hands of the defendant. In *First Heights Bank*, the underlying lawsuit alleged a breach of contract by defendant.

Contrast those cases to this scenario. In this case, there is no underlying lawsuit alleging any damages caused to Lafarge by VTB's conduct. It is not alleged that VTB has breached any obligation with respect to the 2009 Consent Order. VTB cannot be accused of breaching its obligations with respect to the Operating Agreement, as those duties do not even arise until January 1, 2010. Indeed, there can be no analysis of Lafarge's likelihood of success on the merits of its claim, because no claim has been made. Lafarge's suggestion that the extraordinary remedy of preliminary injunctive relief is appropriate in this scenario, where it has not even alleged that VTB has breached any obligation under either contract, borders on frivolous.

### III. CONCLUSION

For the foregoing reasons, VTB's motion (Doc. No. 57) for approval of change of ownership in the Great Lakes Trader and the Joyce L. VanEnkevort is **GRANTED** and the transfer is **APPROVED**.

**IT IS SO ORDERED**.

Dated:   October 27, 2009

　　　　　　　　　　　　　　　　　　**HONORABLE SARA LIOI**
　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

11